All right, Mr. Nagel, good morning, and Mr. Pressman, good morning as well. Mr. Nagel, you're first. May it please the court, Bruce Nagel, firm of Nagel Rice for appellants. The issue of first impression before the court today is the proper interpretation of a single provision of the New Jersey Consumer Fraud Act. So let me start with standing. I thought that the parties had been signaled to deal with that issue. Maybe I'm wrong. We were asked to do supplemental briefs, which we did, so I'll address that. So let me begin by, and I want to make sure, is it Hodge-Parker, Hoke-Parker, how is it pronounced? I pronounce it Hoke-Parker. Okay. There are certainly differences between the two named plaintiffs in this putative class action. And let me begin with Hodge-Parker. If we were to determine that he has standing, why doesn't anybody out there who ever even considered going to Super Bowl XLVIII, someone who has standing? The standing issue with regard to Hodge-Parker is troubling. I certainly agree with that. But it's not troubling to the point that it should be affirmed, the dismissal should be affirmed. Well, what did he do? He lost his opportunity. It's a loss. He elected, he elected not to, quote-unquote, the 86 of the joint event, he elected not to purchase tickets. Because the violation of the act drove the ticket price up over what he was going to elect to do. He had no ascertainable loss then. Excuse me? He has no ascertainable loss. Much less anything to remedy. When did he do his research? I mean, aren't you relying upon some Internet research that he did with regard to tickets and ticket prices? To a certain extent, sure. When did he do it? My understanding is he did it before he attempted to buy the ticket. He didn't attempt to buy a ticket. He set a budget of $1,000 and couldn't find it. He didn't attempt to buy a ticket, did he? Show me in the record where Hodge-Parker attempted to buy a ticket. I don't think it was a factual record on that issue because it was a 12b-6 person. Sure. 12b-6, not a summary judgment. Absolutely. And that certainly makes your showing for standing purposes more relaxed than it would need to be perhaps for statutory standing later or for some of the other issues in this case. But, again, there is a distinct difference in terms of what the allegations in the complaint are as to what Hodge-Parker did and what Finkelman did. One bought a ticket, one only thought about it. I fully agree. All right. I fully agree. However, there is one similarity between the two of them, however, as I understand it. The purchase of the ticket by Finkelman and the thinking about it or research or whatever it is by Hodge-Parker all took place temporarily well after the tickets could have been sought and purchased. That's not the point. I'm not sure where that's – I'm not sure where, Judge Smith. In fact, I think you pled October and November at one point and then came along later on, maybe it was in a brief, and argued November and December for the research being done. What we pled for both is that the price in the secondary market was driven up as a result of a statutory violation. That's what we pled. Okay. Stop right there because I am still – honestly, I am still trying to figure out what the theory of liability is here. I mean, is it the loss of an opportunity to purchase a ticket? Just for Hodge-Parker. That's it. And we acknowledge, as we said in our brief, that the closest we can come to this theory is the loss of opportunity for those who fail to get jobs or fail to apply for jobs because of discriminatory practices. We cited the Fifth Circuit case and we cited the Third Circuit case. The number of plaintiffs that you could have in a case like that would number in the hundreds of thousands. There's no question about that, and these are issues that go to the class certification level. Anybody can step forward and say, by the way, I lost my opportunity. Also, whether or not they really intended to watch a game or not. And I don't disagree with that, but in the context of class action practice, that's exactly what happens at the claims process after cases are settled. We're not at the claims process. I understand that. But we settle cases all the time where claimants have to certify to positions to injury. This is what I bought. This is what I did without proof. So, too, that can be done in this case. Where is the ascertainable loss for a hot marker? I mean, even if you've got, even if, where is it? He didn't. At least Finkelman had an ascertainable loss. That's right. Finkelman has an injury, in fact. Exactly. And, again, I've conceded right up front that it's a lot more troublesome than the Article III analysis. It's page 60 of your brief. And I don't argue with that. I say it straight up front. It's a difficult issue. However, it's not an issue I'm going to concede fully. The ascertainable loss is an esoteric answer. It comes from his loss of the ability to attend the event. The Jersey case's interpreting ascertainable loss does not say it must be a monetary loss. So we would argue that the loss of the opportunity to attend the event, that is ascertainable. What, pain and suffering or something like that? Which we quantify all the time in Jersey trials. So, look, I'm clearly suggesting that I am five steps down the chess board in an unshorted area of the law. And, quite frankly, if you don't mind, as a pal, I'd like to move to other issues. Speaking for myself, I do very much mind. This Court is constitutionally required to look at the standing issue. The district judge didn't decide standing as to Finkelman. That's right. Did not decide he is? That's correct. Judge Smith, I didn't suggest that we move off of the entire standing issue. Just the Hodge-Parker, which I've conceded, is troublesome. So I apologize if Your Honor took that to mean I want to go away from standing. No, I understand. And I'll address directly the Finkelman standing issue, which the judge did not address directly, Judge Barry, because he did so in the context of the causal connection of the Consumer Fraud Act, which, by the way, is all dicta because he already held in the case that the statute does not apply here as a matter of law. So all of the other observations are dicta. But getting back, Judge Smith, let me – Maybe we should send it back for him to make a finding on whether Finkelman has Article III standing. I don't think so because, as I'm going to argue now, he clearly has standing. He suffered a direct ascertainable loss. He suffered the increased cost of the ticket. All right. That's injury, in fact. But you have to show more than injury, in fact. You have to show causation, which is really where I have some questions. Which we do, which we pled. And on a 12b-6, it's accepted as true. And you have the Pollard decision, where Judge Chesler addressed this exact issue. And he said in the Pollard 1 and 2 opinion, he said it both times, there is the causation. There is a connection. Because the marketplace was affected by the restriction of the ticket availability, the prices went up. And there is that in this case. But there was a possibility that he could obtain a ticket at face value. Wasn't there? And, again, this is – If he had entered the lottery, which he never did. Which, as a matter of law, we argue is an irrelevancy. That's an irrelevant legal concept. I'm not sure it's irrelevant. Because he – there were, if I remember correctly, 1,000 lottery tickets. Or tickets made available through the lottery. A little less than 1,000. A little less than that. Yes. But he didn't bother to apply. Nor did he have to. And the reason he didn't have to is because the marketplace had already been affected by the breach. Once we establish the breach, once we establish the statutory breach – You mean because the NFL made – did not make 5% of the – That's exactly right. That's all I have to do. My first step is I need to establish the breach. I may not be following you. Are you suggesting that a naked violation of the statute with nothing more is enough to establish standing? Of course not. I'm suggesting that in this analysis, the fact that he didn't enter the lottery is irrelevant as a matter of law to an Article III issue. And the reason I say that – Can we say that he knew that at the time he chose not to enter the lottery? Did he know that the total volume of tickets was restricted by the NFL withholding back a certain number of tickets? Everybody knew it. It was in all of the press articles. And again, the NFL has done this for approximately 50 years in other jurisdictions. That was a prior practice. And it's fine in other jurisdictions. But Jersey is the most protective consumer statute in the country. The Consumer Fraud Act in New Jersey is broad and protective, and it's been this way since its past. And every case before the Supreme Court says the same thing. Do we have to speculate, though, Mr. Nagle, that had he applied, he wouldn't have gotten a ticket because of the NFL having restricted the number of tickets available? The answer is, respectfully, as a matter of law, I don't think that that relates to the standing issue, but I'll address it head-on. We know that there is an enormous amount of applicants for approximately 900 tickets. The NFL has not disclosed the exact amount, but people know that you have a very, very little chance of ever getting that ticket at face value. So that is, we've argued below. That's merely a function of the secondary market, right? No, it's not a function of the secondary. It's a function of the lottery. I'm sorry. You're talking solely about the lottery. Yes. If your concern is, as the judge below was concerned, again, in dicta, the fact that he didn't enter the lottery is problematic on the causation analysis. Exactly. Under the Consumer Fraud Act. So let's say the NFL offered 100% of its tickets via the lottery. You'd agree that's not a violation of the statute here, right? I haven't thought of that hypothetical. I'm giving you that opportunity now. I would probably say if they offered 100%, it probably, without a lot of analysis, probably not a violation because the statute requires offering it for sale. And if they had done that, if the NFL hypothetically had offered 100%, it wouldn't have mattered here because the plaintiffs began looking for their tickets not until November or December of 2013. And the lottery closes at the beginning of June 2013. They never would have had a chance anyway. Even if the NFL lottery offered all of its tickets, not just 1%. Judge Smith, the issue here is did they offer to the public more than 5%? They say they offered none. Their position is they offered no tickets for general sale to the public. They offered less than 1%. And they did it through a lottery, which is another mechanism. They offered none for sale to the general public. That's exactly right. Because in this 35.1, they're basically saying, well, you know. What they're saying is, and again, they're following these arguments that we think as a matter of law are not applicable. They're saying we didn't have to. We have the right to elect not to sell 95%. But that violates the facial clear statute. So we're back into plain meaning of the statute. Well, we're back. We're getting there. We're into plain meaning. But, of course, all the cases we briefed and all the courts, every court that looked at this, including Judge Sheridan. A couple of two, three district court cases. That's all. There's one state court and two district court. But everybody, including Judge Sheridan, looked at it. That's what? One superior court decision? Yes, one. That's it. Yeah, one superior court decision. Again, brought by the Attorney General and the Division of Consumer Affairs, which interpreted the act exactly as we did. No state appellate opinion. There's no appellate opinion. And that is why we suggested to this court. Cursory opinion by Judge Sheridan. And he never did decide the Article III standing issue as definitive. That's correct. And that's why we've suggested to this court to certify the question of law back to. Can we certify credibly an issue where we have so little here? I mean, we don't know facts. We don't because there's been no discovery. We have no state court experience to speak of. One superior court opinion. And the opinions that are out there are all in granting motions to dismiss. So no one's really going through this whole analysis. And we have a very limited opinion out of the district. Can we credibly certify this? The answer is yes because in response to Judge Smith's concern, the Article III standing issue is tied directly into the causal factor under the Consumer Fraud Act. In order for me to succeed under the Consumer Fraud Act in Jersey, I need to show really the same elements as an Article III standing analysis. If you look at them side by side, they're virtually identical. So in effect, what you say to the New Jersey Supreme Court is as follows. Under these circumstances where the NFL has elected not to release 95% of the tickets, which is what the statute requires, is there in your analysis, is there the requisite elements on the pleadings level to sustain a motion to dismiss? Let them tell us because what you've had a judge do is bizarre. You've had a judge basically turn the clock back. The reason why this statute was passed and you see it over and over again, again even Judge Sheridan who looked at the committee report, there's two areas of this. You're going into legislative history now. No, see this is where you both, both sides, beef up your argument really with, of course, with facts as you either think they should be, although I must say your friends across the aisle don't touch legislative history. Whether they touch it or not, there's not a single opinion that you see in this case. There's three other judges that are viewed at one state, two federal, both of which refer to legislative history and so did Judge Sheridan on two separate occasions. But you only get to legislative history, don't you, if the meaning of the statute is clear? No, no, and we briefed that. And Holy Trinity back in the 1890s, the Supreme Court of the United States said, the meaning of a statute is found in the evil which it is designed to remedy and that's exactly why we need to first define what it is, what the evil is. But can we define it without anything coming from the district judge relevant to this issue? You had it in the Povert case. No, no, I'm talking about this district judge. The district judge, as far as the legislative history, he looked at it. He actually looked at it and you see it cited in two separate occasions. What did he say? First of all, at page 20 of his opinion, he actually said, I'm reading this statement from the Senate Commerce Committee, statement to the bill, and it just says in one paragraph, the bill is amended, address practices of ticket brokers. Sure. And that's the only thing your friends mentioned in terms of legislative history, but a lot more was presented to me. Except the problem, what my friends overlooked is that at J.H., short appendix 27, Judge Sheridan says, but, you know, what I'm trying to find out is what was the legislature thinking about when they enacted the statute. And I'm not so certain they were thinking about the NFL in this context. So even Judge Sheridan is on to it. And look at what Judge Chester did, what was exactly correct in this, and consistent with both the Third Circuit standard and the New Jersey standard on basically defining the ill, what was it in the marketplace? Is it the case that a person, if the NFL makes a certain number of tickets available for the public, let's say in violation of the statute they only make 50,000 tickets available for sale to the public, and you can pick up the tickets at the gate. Supposing there are several people that line up to get those tickets, and the first, let's say, first four people in line buy 49,999 tickets, and the next person buys that last ticket. Mr. Finkelman is behind those five purchasers. No more tickets. Does he have standing? The answer is yes. If the NFL does not, yes, because the statute, we're looking at a simple one-sentence statute which says it's a violation to withhold more than 5%. 50,000 tickets is, I'm sorry, Judge. We have to look at standing. We did. Let's say there is a violation of the statute, but you still have to satisfy standing, and there's no ascertainable loss. Mr. Finkelman, all the tickets were sold out, even though there's a violation of the statute. In this case, less than 1% was released. That violates the statute. Now, let's look at step number two. What's the damage? But the district judge found, quote, 35.1 doesn't apply to the NFL. Exactly. It doesn't apply. It does apply because, as the judge said, and the judge engrafted into the statute a condition that does not exist, because the NFL, according to the judge, was permitted to decide themselves what portion of the tickets they would release. It's a pre-allocation. This has been done for a long time. Which is precisely. . . To exclude, I mean, to insulate the NFL from. . . Not just the NFL. Not just the NFL. The reason, and if you look at the Brokerage Commission, which is in the record, and you look at the Pollard Statement about that commission, the report basically says there has been basically a holdback and a diversion of tickets, that venues, artists, promoters, sponsors, and other insiders get choice seats for less money. And that's not good. So we're going to remedy that by passing the statute. I'm a little sympathetic to your point that there was a violation of the statute. That there was a violation. There was clearly a violation. But you've got to get from that. . . I will. I will. I will. So there's a violation of the statute. You will today or you will later on down the line? No, I will in response. I briefed it and I will address it now, Judge Fuentes. So assume there's a violation of the statute, which has been conceded. That's why I move for partial summary judgment below. The judge deferred that. There was. This is a very interesting case. It's the only case because there's others pending below against concert promoters. It's the only case where they conceded the breach. Now, let's get to the second piece. What's the ascertainable loss, again, under the consumer product? Once they violate the statute, that establishes, respectfully, the Article III standing because according to the pleading and according to Judge Chesler in the Pollard case, that resulted in the increased price of tickets in the marketplace. Judge Chesler agreed with us. Pollard 1 and 2 agreed with us. That case is now pending. So now, what is the ascertainable loss? It's easy. When Fickleman paid $2,000 for a ticket that had face value around figures $800 to $1,000, he suffered a loss. The reason why he had to pay $2,000 a ticket is because there was a restriction of available tickets to the public because the statute had been violated. But there were available tickets at face value. Less than $900. Did he apply? Through the lottery. Through the lottery. Again, that is in a, respectfully, that's in a relevant legal analysis that you require him to partake in the illegal scheme. There's a breach. The marketplace is restricted as far as access. And then in order for us to sue, you require us to go into a lottery, which is a nullity. They won't even release to us the amount of people that apply. We can't get that information. When did Mr. Fickleman begin looking for a ticket? I can't tell you that on this record. Isn't there a record? I don't believe it is, no. I can't tell you because there's been no discovery. I would bet that if all 95,000 tickets, I don't know if that number is correct. I think it's about 80,000 to 90,000 tickets. It has been made available online at face value. They would all be gone in a heartbeat. Seating is 80,000 at the moment. Yeah. All 80,000 tickets. But we don't even know what the available seating is, available seating is. Well, sure we do. You say it's the, you don't know, that's disputed here. You say it is the entire venue, the number of seats in the entire venue. I think your friends say it's the amount of tickets, you know, available to the general public for sale. According to them, a lot of work. But Judge Barry, that's not what the statute says. It's a one-sentence statute. It says you cannot withhold more than 5% of available seatings to the event, which means it's in the Meadowlands. But what's available? You see, available, what is available? To the event. It's simple. To the event. We have a stadium. People went in with tickets. Approximately 80,000 people are there. And they concede. Whatever it may be. In this case, for this record, it's an easy answer. They only let out to the public less than 1%. That's easy. So we know there's about 80,000. We know 80,000 people were there, plus or minus. We know the public only had access to less than 900 tickets. Now, that's the breach. That's the breach of the statute. From there, what's the ascertainable loss? We say Judge Chester and Pollard was right. The ascertainable loss as we've pled, and again, it's a 12B6. We've pled this increased the price of tickets in the secondary market, and he paid for it. That's the ascertainable loss. And that is traceable to the NFL? That's traceable, yes, to the breach. By restricting the tickets, by violating the statute, it's traceable. And I've engaged, even before I filed suit, a Harvard economist to do exactly that. He's going to testify, hopefully at some point, issue a report, that the reason why the ticket prices went up is because it was a highly restricted access to the public. It went from, round figures, 80,000 tickets to under 900 tickets. That's a problem. Let's say there were 80,000 tickets that were made available. All 80,000 tickets would be posted, would be available online to the general public. I have no problem with that. There's no violation. That's fine. To resellers. But there's no violation. And then the resellers would be charging $2,000, $3,000. There's no violation of the act. I wouldn't be here. The reason why we're here is because they concede we restricted the sale of 1%. That's why we're here. Let's say they made 70,000 tickets available online, and that's a violation of the statute. Because it's less than, it's more than 5%. All of those tickets would be brought by ticket resellers. Once they violated the act, it's not difficult through expert testimony to establish the fact that the reason why the price in the secondary market went up is because of the violation. The price rose because the tickets were restricted. Supply and demand raises the price. That's through Economics 101, if I remember my first year at college. So the reality is, yes, that's the ascertainable loss. And, again, in an Article III standing concept, those issues are, once again, virtually coextensive, identical with the elements I must prove under the New Jersey Consumer Fraud Act. So if there's any concern you have, I suggest, as we argued, certify it. Certify it. Because, again, every opinion out of the New Jersey Supreme Court on this issue is, it's an act that's got to be liberally construed, and it is the most protective consumer act in the country. And, again, I suggest that it is, Judge Berry, it's critical, it's critical to identify the evil. Why turn the clock back on a statute that remedied the evil? You have some time on your bucket list. I'm sorry. I'm sorry. Yes. Mr. Pressman? Mr. Pressman, you don't dispute that you violated the statute, do you? We absolutely dispute that. You do? Absolutely, Your Honor. If you look at the plain language, and as this Court has written, the first canon of statutory interpretation is to look at the plain language of the statute. And if the language is plain and unambiguous, as both parties agree. You live or die on plain meaning, right? Yes. Not at all. If we get to the statutory issue past standing. If we get to the statute. Correct. If you get to the statute, we do not live and die on plain meaning. The plain meaning supports our position and only our position. But, Your Honor, if you get to the legislative history, that also supports our position. Because what they talk about. Why don't you mention it in your brief? You mention only the title of the committee report or something. But you avoid the legislative history, like the plague, and those portions of it that I read in the appendix, I can see why. Well, Your Honor. You try the emphasis, you wanted the demonstrative evidence, the meaning of this one-sentence statute, and you gave slides to the district court on the plain meaning of this one sentence. You really want to win on plain meaning. You don't want to see this go back, and you don't want to see this certified. This is a very simple issue for us to decide or not to seek certification. We shouldn't waste the time of the New Jersey Supreme Court on an issue as simple as this, the plain meaning of 35.5. Judge Barry, I agree. I think it is a simple case. Then let's walk through the plain language, because we're obligated to do that in the first instance. We only turn, nor should we turn to legislative intent in the form of legislative history, if the plain meaning doesn't reveal to us the answer that we're looking for. So walk us through the statute. And in doing so, I'm sure we all have some questions. In the first phrase, it shall be an unlawful practice for a person, comma. I have no idea why there's a comma there for a person who has access, but there is. The NFL is a person. The NFL is the defendant here. They're a person, right? For the purposes of the statute, correct. But for the purposes of the statute. Correct. They have access to tickets also, correct? Correct. To an event. The Super Bowl is an event. Correct. Let me ask you now, if the clause that begins prior to, look at that. Prior to the ticket's release for sale to the general public, comma. Imagine that's deleted. Just take that out, if you have the statute before you. So that it reads, it shall be an unlawful practice for a person who has access to tickets to an event to withhold those tickets from sale to the general public in an amount exceeding 5% of all available seating for the event. If we took that clause out, that wouldn't change anything for purposes of what this statute intends, as far as the plaintiff's theory is concerned, does it? I think it does change it. How? In fact, I think that's exactly, Your Honor, what the plaintiff is trying to do, is to take out that qualifying language. All right. So what does that language mean? That language qualifies what tickets we're talking about, because it makes clear that the tickets the statute is addressing are tickets that are in the ordinary course to be made available for public sale. This is the intent issue that the district court was talking about, the tickets intended? That's correct. Why doesn't your construction of that put all of the power, then, into the hands of the person who has access to the tickets to determine through his or that entity's consent what's going to go to the public and what isn't? That can't be the intent of the statute, can it? Well, it certainly, Your Honor, allows somebody who creates an event to decide that that event is not going to be open to the general public. It absolutely allows that. You can withhold 97% of the tickets. Your Honor, if you want to... Yes, if you don't put any on sale. Correct, and it absolutely allows the person... That's your position. If you don't put any on sale, a sale to the general public, then by definition you haven't withheld any. Absolutely, and that happens all the time. A subscription theater company that decides that it's not going to put all the tickets on sale to the general public. So by creating the lottery, have you hoisted yourself on your own petard? Not at all, Your Honor, because the ticket... This law only pertains to those that are released to the general public. The lottery tickets are not tickets that are released to the general public, and that you get from the plain definition of general public. Going back to Judge Smith's point, if I get your argument correctly, you can pretty much game the system. You can just decide. You can withhold 99% of the tickets because you say, I'm not going to put them up for sale, I'm going to divvy them out, even give them to resellers who will then sell them at three times value. I only have 1% of the tickets and I'm going to release them in a lottery format. You can do that. And, of course, you mean... Your Honor, you could not do that. You means everybody, every person covered by this statute, because we recognize NFL's ticket allocation system has existed for years. Absolutely. So let me get back to your question, Judge Fuentes, and let me tell you why you could not dupe the system. Because the system is not designed to effect tickets that are never intended from the get-go to be available to the general public. The system is designed and, in fact, works with respect to those events for which tickets are unquestionably to be made available through a public sale and it prevents somebody from coming in the 11th hour and saying, you know, this looks like a popular concert. I understand they're going to be made available to the general public, but I want to scoop up a percentage of these tickets to profit on the aftermarket. It works for that. Are you giving some thought to what the legislature had in mind when the legislature crafted this statute? The number of thousands of people show up at an event ready to buy tickets, or even online, only to find out that they're all gone. And the people that show up at the gate can stay there for hours and hours and hours and finally get to the gate and the sign sold out comes down because the event coordinators are determining what they're going to hold back and what they're not going to hold back. Actually, Your Honor, and Your Honor's question is seized upon a key point. They're showing up at the gates, they're showing up at the box offices. What the materials submitted by appellants demonstrate and describe is the diversion of tickets from initial public sales. And, in fact, at page 17 of the record, that is what appellants' counsel says. It says time and time again they repeat the same concept, the initial diversion of tickets away from the initial public sale. It follows that if there is no public sale, the statute is not triggered. Actually, under your theory, you could have withheld 100% of the tickets. Absolutely. In fact, that is our position is that none of the Super Bowl tickets are released by the NFL to the general public. And, in fact, they'll agree with that. The only distinction is they think 1% through the lottery is released to the general public. But you decide that no tickets, no tickets are released to the general public and then the district judge says that at page 39 of the joint appendix, 35.1 doesn't apply to the NFL, period. I think what Judge Sheridan meant there was it didn't apply to the NFL's distribution, not that it didn't apply to the NFL, that the NFL didn't qualify as a person. It seems to me you're in charge here. I mean, and you're blaming some other guy did it, but it wasn't us. I have a feeling if we validate your position, event coordinators will always use your model. They would never have tickets available for public purchase. That's not correct, Your Honor, because what that overlooks is the economic reality. The Super Bowl is not a typical event. It's not like the concerts that have been viewed in the other cases where they have to go to every different market, and certainly if they decide they're not putting tickets on sale to the general public, they're going to lose a lot of money. The Super Bowl, as Your Honor says, if you put them on sale to the general public, they'd sell out like that. What this statute says is, and what it doesn't do, is it doesn't require that anyone holding a ticketed event in New Jersey, regardless of the nature of that event, make the tickets available to that event to the general public. Can I return to your position that none of your tickets are made available to the general public? Because I'm still not clear on why the participants or applicants in the lottery process are not members of the general public. The reason why, Judge Smith, is this. When you look at the definition of general public, and we offer MacMillan's Dictionary, they don't offer any response to that. It says members of the public at large, a concept examined by the District of New Jersey in the Cantor case. Public at large. People in ordinary society who are not members of a select group. Now, MacMillan's gives an example of that. Members of the Board of Directors may be members of the public, but all members of the public are not members of the Board of Directors. It's a subset. With respect to the lottery, lottery tickets are not distributed just to the general public. You can't walk off the street and say, I'm buying a lottery ticket. You have to go through three steps. You have to enter the lottery between February 1st and June 1st of the year prior to the Super Bowl. I don't see how those steps affect who the pool of applicants or interested applicants are and why that is not open to every Tom, Dick, and Harry, Jane, Joan, and I give up on other names. No, you're right, Judge Smith. Why can't every one of those persons get online, apply, and why aren't they the general public? You're absolutely right. The lottery process is open to the general public. Anybody, any Tom, Dick, or Harry, can enter the lottery. A thousand tickets are released through the lottery. Correct. A thousand tickets are released through the lottery. Well, that's this case, but you can determine the size of the tickets available through the lottery. Correct. And by the way. That's why available seating is more than, to me in any event, is more than the total number of seats in the venue. It's less than the total amount. Correct, Judge Ferry. It could be the total or it could be zero. Correct. If you release 100% of the tickets through a public sale. And you're saying it's zero. I'm saying zero. But here's the thing, Your Honors. Who's the consumer being protected here in this statute? Who's being protected? The consumers who wish to purchase tickets through initial public sales and who are unable to do so. And there are none here. There are none here because there was no initial public sale. They're the general public according to the legislature, aren't they? Isn't that who's being protected? They chose to use the word. Absolutely the general public, but it is what are they being protected with respect to? They are being protected with respect to their ability to purchase tickets that are available through an initial public sale absent withholding of any of those tickets in an amount in excess of 5% of the amount available through the public sale. And, in fact, that's what you get. And I want to proceed with something Your Honor brought up originally, which is reading through the statute. That is what you get when you read the statute. It shall be an unlawful practice for a person who has access to tickets to an event prior to the tickets released for sale to the general public to withhold those tickets, those tickets, tickets that are to be released for sale to the general public. That still gets us back to the question all three of us asked, which is that leaves it within the power of the person with access to the tickets to define what those tickets are, whether they're reserved. What it allows for somebody to determine is the character of the event. It allows for the person who creates the event to decide if it is going to be an event open to the general public or an event which is not open to the general public. But once that determination is made that it is an event open to the general public, the statute kicks in to prevent anybody from withholding tickets to be made available to the general public in an amount in excess of 5%. The Super Bowl is not an event open to the general public? The Super Bowl is not an event for which tickets are available to the general public. I thought you conceded that the lottery portion of it is the general public. I did not. What I said was the lottery tickets are not given to members of the general public. The lottery tickets are given to winners of the lottery. Now, what I said was the lottery itself is open to the general public, but you have to submit an entry, win, and then exercise the option to purchase the tickets. But here's the thing. Your argument is this statute has no applicability to you at all. To this function, this event, correct, to the Super Bowl. It does not affect the Super Bowl because Super Bowl tickets are never subject to initial public sale. And here's the thing, Judge Smith. The Super Bowl is super. That's because you decided it. That's right. That's the pre-arranged, pre-allocation scheme. With my colleague's indulgence, could we turn to the standing issue? Could I add one point with respect to the analysis? And then quickly get to standing. Absolutely. If this court is to accept the reading of the statute as opponents offer it, it would outlaw, you couldn't have season tickets for a sporting team at all in New Jersey. And yet, in 35.3, two sections below 35.1, there is a procedure by which event venues must allow season ticket holders specifically to sell their tickets back for games they can't attend. So if you accept their position, and they say this on page 17 of the appendix, they say it would outlaw season tickets. If you accept that position, then why would you legislate? Only if the season tickets exceeded 5%. Correct. Correct. But if you did that, why would you legislate a section in the very same statute, on the very same page, that provides a means by which season ticket holders can sell those tickets back, and would outlaw any event's ability to have a function not open to the general public. You couldn't have a subscription theater group. Pope Francis comes to visit New Jersey. The parish couldn't devote tickets to people out. There were parishes for church members. I have to comment that Pope Francis ignored New Jersey when he came to Pennsylvania. Could we turn to the standing issue? Correct. He had New Jersey at his heart. He flew over it. That was enough, I think. I think the point is, when you look at the practical effects, it doesn't add up. Can you say that, I want to get to standing also, but I'm looking at this phrase, which is who has access to tickets to an event. But if there were season tickets, you would not have access to those tickets, would you? I mean, season tickets are restricted, aren't they? The claim is, is that the team would have access to the tickets, obviously. Prior to the tickets were limited. Correct. Correct. Including season tickets. Correct. Absolutely, because the team distributes the tickets. So if you read their brief and you accept their position. Hopefully, Mr. Nagle will address that when he returns on the boat. You couldn't have a Rutgers homecoming football game and get tickets to. . . I don't understand, Mr. Brassman, why you're not just chomping at the bit to get to the standing issue. Let's get to the standing issue. I guess I'm missing something. No, I think I am, Your Honor. I apologize. Standing. Clearly, neither plaintiff has standing. Plaintiff Hawk Parker has no standing because he has no injury. There's no causation and there's nothing to redress. If, I think, Judge Smith, you put it right, and Judge Pointes, you also said the same thing. If Hawk Parker has standing, everybody, whoever gave a moment's thought to attending a Super Bowl would have standing. Mr. Nagle has conceded that there is a profound difference between Mr. Hawk Parker and Mr. Finkelman. So let's talk about Mr. Finkelman. Sure. Mr. Finkelman also does not have standing. Mr. Finkelman certainly has shown no causation, as Judge Pointes pointed out. He never even tried to enter the lottery. He is essentially trying to equate a failure to try with a trial that results in no tickets. For standing purposes, and I'm talking about Article III standing, for Article III standing purposes, we could say that he can demonstrate an injury in fact. I mean, we can monetize the difference in the ticket price. Absolutely. So he can get past that particular first hurdle. Certainly with respect to standing. Let's focus on causation as one of the standing hurdles. With respect to causation on Finkelman, Finkelman admits he never even attempted to enter the NFL lottery. They submit the article. It provided the deadline by which lottery tickets were due, or lottery entries were due. He never even tried. Never even tried. And therefore, because he never tried, he can't say that he wouldn't have gotten tickets at face value. I believe he has, or the plaintiffs have, made reference to several of the employment cases. Two cases. Two cases. Are those two cases applicable? No, they're not. Why not? No, they're not. Because first is Phillips. In Phillips, the standing could not turn on a loss of employment opportunity. It turned on a question of the ability to represent a class under Federal Rule of Civil Procedure 23. The only case that even talks about a loss of job opportunity as a potential basis for standing is Howard. Now, in Howard, the court found that there was no standing, but it also talked about whether or not a loss of opportunity could confer standing in an instance where somebody had attempted. The women had already flunked the written test. Correct. They couldn't pass the physical test. And that that was administered in a discriminatory manner. That's right, but they didn't have an opportunity. Correct. They had already lost the, they had already flunked the written. Absolutely correct, Judge Barry. And so at the end of the day, the court's analysis in Howard is, yeah, if you attempt to partake in something and you're denied that opportunity, if somebody interjects to deny you a job opportunity, that loss of job opportunity may confer standing. But there's no fundamental way to go see the Super Bowl. So there's a distinct difference between Howard in this case in a number of respects. Again, there's nobody, there's not even a claim here that the NFL interceded to prevent Finkelman from entering the lottery. He simply chose not to do it. Was the NFL's restriction of the amount of tickets available for the public that resulted in Finkelman not being able to get a ticket? No, Your Honor. Are you talking about with respect to the lottery? And the $2,000 it would cost him to get a ticket. Your Honor, I think going back to the analogy or the example you used earlier, if the Super Bowl was put on sale to the general public, tickets would sell like that. I think what appellants are blinded to is the natural forces of supply and demand. One of the other points we raised with respect to causation on standing and otherwise, is that there is absolutely no showing here that even if the NFL released all of its tickets for free, that Finkelman wouldn't have still had to pay $2,000 or more. And in fact, and this perhaps gets to the ascertainable loss, and I don't want to get off standing, but in fact the record shows that at the time Finkelman purchased his ticket for $2,000, Hawk Parker saw the tickets, and the cheapest tickets he saw on the market were $4,300. You're saying Finkelman got a bargain. Finkelman got his tickets for less than half of what Hawk Parker saw them advertised for. But don't leave standing. Finkelman would have to show that his loss is traceable to the NFL. Correct. Right? Correct, and he can't do that. He can't do that because of two things. Very clearly, he never entered the lottery, so as Judge Sheridan correctly decided, he can't show that he wouldn't have gotten tickets at face value. And you say no other tickets were available, period, because none were for sale. No other tickets available to members of the general public? Yes. Is he not a member of the general public? Correct. No other tickets were available. The only way for Mr. Finkelman to obtain the ticket to the Super Bowl, apart from the secondary market, was to the end of the NFL lottery, something he chose not to do. And then, of course, because there's no causation, you don't even get to redressability. But I think what Judge Sheridan did was he said, well, as Judge Smith identified, there's certainly an allegation of an injury here. That allegation of an injury certainly at least addresses that component of the standing analysis. And certainly at the motion to dismiss stage. But he didn't decide Article III. He explicitly did not decide Article III standing. He said it's appropriate to decide this issue under the causation element of the prima facie case of the CFA. But he explicitly did not decide the standing issue, the Article III standing issue. He said, while Finkelman's conduct raises clear implications of standing, it is better examined. It is better examined on the prima facie case. Correct. Correct. That was the conclusion. He decided under Article III. Correct. Okay. Correct. I mean, what he essentially said was, I'm not going to decide under Article III. There's no prima facie claim here. Because they haven't demonstrated a violation of the statute or causation. Causation for the same reasons we've discussed with respect to standing. And then ascertainable loss, he never got to. But they can't show ascertainable loss either. And I think that's something that Judge Puente has indicated during your questioning of Mr. Nagel. What's the ascertainable loss? There is no ascertainable loss. Mr. Nagel says this is at the 12B6 stage. And he has an expert all lined up ready to show that there is an ascertainable loss. Well, here's what his pleading shows, Your Honors. Page 90, paragraph 49 of the complaint. What Mr. Nagel says, and this is the allegation upon which his claim is based. Violation of the statute is a violation of the New Jersey Consumer Fraud Act per se. And the NFL is strictly liable for that violation. That does not appear anywhere in the statute. Nowhere. In fact, the statute says just to the contrary. Under Section 19, you must show a violation of the statute, ascertainable loss, and causation. And what the New Jersey Supreme Court said in Weinberg, and what was found in the New Jersey Citizen Action was, what appellants are trying to do, and what other appellants have tried to do, and other claimants have tried to do, was eviscerate the distinction between the Attorney General's right of action. The Attorney General can take action regardless of ascertainable loss with no showing of causation, just on the basis of the statute. They are trying to eviscerate the distinction between what the Attorney General can do under the act and what a private litigant can do. But the private litigant is held to a higher standard. Here, the only way they try to meet that standard is by claiming that this is a strict liability statute. I want to get back to Mr. Nagel. Mr. President. Thank you, Your Honor. Thank you very much. Mr. Nagel. Thank you. I'd like to just move through this really with a logical chain, if I could, very briefly. The statute remedied the very thing that the NFL did. The NFL determined what they're going to release. The NFL determined what, in quote, the available seats would be. Addressing Judge Barry. That's exactly what this statute stopped. And every place you go, you see the same thing. We are stopping the power of the promoters to withhold and determine for the public what you're going to be allowed to buy. That's done in New Jersey. When this statute was passed, it was passed to specifically eliminate it. It's all through my brief. Number two, if that's the case, why turn the clock back and give to the NFL the option to determine what seats are available, which the statute eliminated, and determine what amount the public's going to get. We revert back to the question of loss, Mr. Nagel. I'm going to get to that. Mr. President makes a pretty good example, or provides a pretty good example. He says, well, we can put all the tickets, 80,000 tickets, out to the public at $100 apiece, or we can offer them for free. You still have to show them. We're not dealing with offering for free. All those tickets would disappear in a moment. We're not dealing with for free. Again, the statute only deals with tickets that are sold. Once a promoter decides to sell, then he's bound by the statute again. This statute isn't on its own. It's not laying in a different area of the statute book. It was put in the Consumer Fraud Act. Why? We need to protect you. It's there for a reason. Protect against what? Protect against exactly what the NFL did. Let's assume there's a violation of the statute. Okay, now we'll go to that. And I want to quote to you two things on that issue. Page 13 of the Pollard Opinion addressed my argument precisely, and I strenuously argue that it should be followed. Judge Chesler, in the Pollard Opinion, said, We did establish ascertainable loss and causal connection. Why? Causal connection. Why? Because the withholding of the tickets triggered, according to him, damage based upon the economic reality of supply and demand. We addressed this very issue. The causal link to the statutory violation is that the marketplace is restricted, the public has access to a few tickets, and economically, the price goes up. So that causal connection has already, by at least one federal judge in this district, has already accepted that argument. You don't hear anything at all from the NFL on that. They don't address it at all. And nor is there any suggestion whatsoever, in anything, that we are obligated to partake in the violation itself in order to have standing. They violated the act by putting 1% in a lottery to the public. Nowhere, nowhere has anybody said that I have to partake in the statutory violation in order to then say you breached. They breached by not permitting access to 95% of the tickets. That's the breach. The damage is established through an economic theory. And if this panel affirms this case, it says to every promoter in New Jersey, you do not have to follow the act. It gives back to the promoters exactly what the legislator took away from them when they passed the act. And that is the option and the power to decide who gets what. That has been outlawed. And I suggest that you reverse and send it back. Thank you. Thank you, Mr. Nagel. Mr. President, thank you very much. Very well presented arguments. And we'll take the case under advisement. We'll recess. We'll recess.